UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the Matter of:<br>ISAAC MCWILLIAMS<br>SSN:   XXX-XX-0547<br><br>Debtor(s). | CASE NO.  15-83117-CRJ-7<br><br>CHAPTER 7 |

| | |
|---|---|
| ISAAC MCWILLIAMS<br><br>Plaintiff(s),<br>v.<br><br>REDSTONE FEDERAL CREDIT UNION<br><br>Defendant(s). | AP NO.  16-80011-CRJ-7 |

## MEMORANDUM OPINION ON COMPLAINT TO DETERMINE EXTENT AND VALIDITY OF REDSTONE FEDERAL CREDIT UNION'S JUDGMENT LIEN

Before the Court is the Plaintiff's Complaint to Determine the Extent and Validity of Lien Claimed by Redstone Federal Credit Union ("Redstone") against real property owned by the Plaintiff. On November 16, 2015, the Debtor filed for relief under Chapter 7 of the Bankruptcy Code and listed his place of residence as 27631 Azalea Trail, Athens, Alabama. The Plaintiff argues that there is no non-exempt equity in his principal residence for Redstone's judgment lien in the amount of $13,287.46 to attach and seeks to avoid the judicial lien pursuant to 11 U.S.C. § 522(f)(1)(A).

The Court conducted a trial of this matter on September 9, 2016 and heard the testimony of Julie Glenn Davis, a Certified Residential Real Property Appraiser, Bill L. Nettles, a Certified General Real Property Appraiser, and Isaac McWilliams, the Plaintiff, regarding the value of the subject property. The Court having considered the evidence, testimony, and arguments of counsel, and for the reasons set forth below, finds that as of the petition date on November 16, 2015 the fair market value of  Mr. McWilliams'

residence was $93,000 for purposes of determining the extent of validity of Redstone's lien on the subject property. In support of this ruling, the Court finds as follows:

1. "Determining whether avoidance is allowed, and if so, the extent of any avoidance, is a two step process. . . . . First, the court must determine the fair market value of the property as of the petition date. *See* 11 U.S.C. § 522(f). Second, the court subtracts from the property's fair market value 1) the amount of any consensual liens and 2) the amount of any exemptions allowed under state law. *See id.* § 522(f). The remaining amount, if greater than zero but less than the judicial lien amount, is the amount that the debtor must pay to the judicial lien holder(s). The difference between the original amount of the judicial lien and the amount the debtor must pay based on the § 522(f) calculation is the amount avoided. The debtor bears the burden of establishing the fair market value of the property as of the petition date. " *McDuffie v. West (In re West)*, 2016 WL 4186853 *2- 3 (E.D. N.C. 2016).

2. When determining the fair market value of property, "[a] bankruptcy court is not bound by the expert reports or opinions of appraisers and may form its own value of the subject property. *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, at *6. The court may accept an entire appraisal or give weight to only a portion of the report. *Id.* When competing appraisals are submitted, the court must consider portions of each report in order to arrive at a realistic market value. *Id.* When two competent appraisals presented by qualified appraisers provide widely divergent values, heightened scrutiny is appropriate." *Int'l Bank of Com. v. Davis (In re Diamond Beach VP, LP)*, 506 B.R. 701, 717 (Bankr. S.D. Tex. 2014).

3. In this case, both appraisers are duly licensed in the State of Alabama to conduct residential appraisals. Both are experienced at performing residential appraisals, and both provided competent testimony.

4. The primary difference in the valuations opined by the two appraisers is: (1) their difference in the determination of whether the size of the property or the location of the property selected as a

2

comparable sale was more important, and (2) their difference in considering and weighing the impact on the value of the condition of the subject property.

5. Mr. Nettles' testimony and appraisal report stress the importance of finding comparable sales of approximately the same square footage as the subject property, even if it requires finding comparable sales more than five miles away. Ms. Davis' testimony and appraisal report stress the importance of locating comparable sales within a one mile radius to insure that the comparable sales are in the "same marketing area and school districts as the subject property." Davis Addendum. Both Appraisers then made what they believed were necessary adjustments for the location or size differences.

6. Mr. Nettles' appraisal report lists five comparable sales that he considered to determine the market value of the subject property, which range from 1,356 square feet to 1,596 square fee, and range in proximity from .15 miles to 5.46 miles from the subject property.

7. Ms. Davis' appraisal report lists five comparable sales that she considered to determine the market value of the subject property, which range from 1,283 square feet to 1,840 square feet, and range in proximity from .07 miles to .79 miles from the subject property.

8. None of the comparable sales used by the two appraisers overlap due to the differences in emphasis of size versus location, although Ms. Davis' Comparable 2 contains 1,578 square fee and is .79 miles from the subject property, but was not utilized as a comparable sale by Mr. Nettles. It has a sales price of $134,500.

9. From a comparison of the sales prices for the comparable sales used by the two appraisers, it is clear that all of the properties used as comparable sales that are located over one mile from the subject property have a sales price of less than $100,000, and that all of the properties used as comparable sales that are located within one mile from the subject property have a sales price of over $100,000, except Mr. Nettles' Comparable 3, which has a sales price of $98,000.

10. Based upon an assessment of the two appraisal reports and testimony of the appraisers, basing comparable sales on proximity to the subject property rather than size appears to be a better method to determine market value. Location is a vital ingredient in determining market value of residential real estate.

11. Both appraisers also differed on the recognition of and weight given to the condition of the subject property. Although both appraisal reports state that the subject property is in "fair" or "average" condition, Mr. Nettles' appraisal report and testimony, along with the corroborating testimony of Mr. McWilliams, detailed certain problems with the condition of the property that Ms. Davis' appraisal report and testimony did not take into account or weigh very heavily.

12. Mr. Nettles opines that significant repairs are needed to the garage ceiling, master bedroom ceiling, kitchen cabinets, etc. Mr. McWilliams' testimony confirmed the existence of these maintenance problems. Yet Ms. Davis testified that she did not notice certain problems such as the kitchen cabinets separating from the wall or the master bedroom ceiling damage, and therefore did not adjust her appraisal for them.

13. Mr. Nettles testified that he has knowledge and experience in repairing homes, and that in his opinion it would cost "close to $20,000" to repair the serious deferred maintenance issues he observed. Mr. Nettles testimony on this issue was not challenged or refuted by Ms. Davis. Ms. Davis testified that she is not experienced in building or home repair and therefore she gave no opinion as to the possible cost to remedy the items needing repair listed by Mr. Nettles.

14. Based on the foregoing analysis, it is the Court's ruling that the value of the subject property opined by Ms. Davis of $112,000 must be adjusted downward by "close to $20,000," or $19,000, to take into account repairs and deferred maintenance as opined by Mr. Nettles. Therefore, the value of the subject property as of the petition date for purposes of this case is $93,000.

15. At the conclusion of the trial, the parties stipulated that Regions Mortgage holds a first mortgage on the property with a principal balance on the petition date in the amount of $80,269.66.

16. Redstone therefore holds a lien on the subject property in the amount of $7,730.34 after accounting for the mortgage lien of Regions Mortgage and Mr. McWilliams' homestead exemption.

An Order consistent with this Memorandum Opinion will be entered separately.

**IT IS SO ORDERED** this the 16th day of September, 2016.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge